# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **VONNA K. CRAWFORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:12cv0052 CAS** |
| | ) | **TCM** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Vonna K. Crawford for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433.

Ms. Crawford has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Vonna Crawford (Plaintiff) applied for DIB in December 2009, alleging she was disabled as of January 1, 2008, by depression, anxiety, a colon resection, thyroid problems, rotator cuff surgery, and arthritis. (R.[1] at 129-35, 175.) Her application was denied initially

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

and following a hearing held in November 2010 by video conference before Administrative Law Judge (ALJ) Douglas S. Stilts. (Id. at 16-29, 34-67, 70-74.) After reviewing additional evidence, see pages 19 to 20, infra, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Jerry Decibel, Ed.D, C.R.C.,[2] and L.P.C.,[3] testified at the hearing.

Plaintiff, then one month shy of fifty years old, testified that she lives with her husband and two children, a daughter who is seventeen years old and a son who is twenty-two. (Id. at 40.) The highest grade she completed was the eleventh grade; she did not have any further education or any vocational training. (Id.)

Asked by the ALJ about her job as a relief worker at the post office after her alleged disability onset date, Plaintiff explained that she was doing her best to be there, but could not do another job. (Id. at 43.) Also, she has been receiving unemployment benefits because she left a full-time job to go to a part-time job. (Id. at 43-44.) Specifically, she left a forty-hour-a-week job as a cashier at Sam's to work at the post office because it was not as hard and she made more money. (Id. at 44.) A requirement of her receipt of unemployment benefits is that she try to find a full-time job. (Id.) She has applied for jobs as a cashier. (Id. at 44-45.)

_____

[2]Certified rehabilitation counselor.

[3]Licensed professional counselor.

She works where she does because they understand she sometimes needs to "pull the window down and go to the bathroom at any time." (Id. at 45.) Nine times out of ten, she would not be able to do another job. (Id.) Nor has she been offered another job. (Id.)

Plaintiff explained that she cannot eat the night before she goes to work. (Id. at 46.) Her colon problem is such that she has to go to the bathroom within ten to thirty minutes of eating something, depending on what she eats. (Id.) After the removal of her tumor, her colon is six and one-half inches long. (Id. at 46-47.) She has an "inherited cancer." (Id. at 47.) She spends a lot of time in the bathroom. (Id.) When she comes home from work, she immediately goes to the bathroom and stays there until it is time for her to return to work. (Id. at 48.) She often has accidents where she "messes" her clothes or bed linens. (Id.)

If she does not eat, she gets dizzy, has headaches, and has muscle spasms in her low back. (Id. at 49.)

She usually works for four hours at a time. (Id. at 51.) If she has to use the bathroom when at work, she "put[s] a note on the outside of the window, 'Please excuse me, you know what I'm doing. It's Vonna.'" (Id.) The customers will then leave and return later. (Id.)

Plaintiff also had rotator cuff surgery. (Id.) Now, she cannot throw a ball or pick up a gallon of milk with her right arm. (Id. at 52.) She has difficulty reaching overhead. (Id.)

Plaintiff has had problems with depression and anxiety since 2008. (Id. at 52-53.) She takes medication for the problems. (Id. at 53.)

Plaintiff prepares meals daily for her children, but does not do the dishes or any household cleaning. (Id. at 54.) She puts the laundry in the washer; her children pull it out.

(Id.)  She does not do any yard work.  (Id. at 55.)  Friends and family come to her house to visit.  (Id. at 56.)  She attends church on Sundays, but is away from home for no longer than seventy minutes.  (Id. at 56-57.)  She cannot stand for longer than ten minutes before having to sit down.  (Id. at 59.)  Also, she "had cancer in the gland of [her] parathyroid" and now has to take thyroid medication.  (Id.)

Her condition is worse since her last surgery.  (Id.)

Dr. Decibel testified without objection as a vocational expert (VE).  He characterized Plaintiff's clerical job at the Post Office as light, semi-skilled with a SVP of four[4]; her job in assembly production was light, unskilled with a SVP of two; her job as an assistant manager at a convenience store was light, skilled with a SVP of six; her job as a cashier/checker was light, semi-skilled with a SVP of three; and her job as a permit clerk was light, semi-skilled with a SVP of four.  (Id. at 61-62.)

The ALJ then asked him to assume a hypothetical claimant who had the residual functional capacity (RFC) for light work[5] with additional restrictions of not performing any overhead work with her right upper extremity and avoiding moderate or greater exposure to

---

[4]"The SVP [specific vocational preparation] level listed for each occupation in the DOT [*Dictionary of Occupational Titles*] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance.  At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation.  2 *Dictionary of Occupational Titles* app. C at 1009 (4th ed. 1991)."  **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).  An occupation at SVP level four requires over three months up to and including six months.  DOT app. C at 1009.  Level six requires over one year up to and including two years.  Id.

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

workplace hazards.  (Id. at 62.)  The VE testified that such a claimant could perform Plaintiff's past relevant work as a post office clerk, cashier/checker, assistant manager, assembly production worker, and permit clerk.  (Id. at 62-63.)

If this hypothetical claimant needed to have at least one fifteen-minute break during work to use the bathroom in addition to the standard morning and afternoon breaks, she would need an accommodation from her employer.  (Id. at 63.)

At the end of the hearing, the ALJ informed Plaintiff's counsel that he would leave the record open for a short time so that she could submit earnings records to refute his finding that Plaintiff had substantial gainful activity in the second and third quarters of 2009.  (Id. at 39, 64.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and various assessments of her physical or mental capabilities.

When applying for DIB, Plaintiff completed a Disability Report.  (Id. at 174-83.)  She listed her height as 5 feet 9 inches and her weight as 200 pounds.  (Id. at 174.)  Her impairments, see page one, supra, first interfered with her ability to work in January 2008 and caused her to be unable to work at the same time.  (Id. at 175.)  She has worked since, however, but is working fewer hours.  (Id.)  She completed the eleventh grade; she had not been in special education classes.  (Id. at 182.)

Asked to describe on a Function Report what she does during the day, Plaintiff reported that, after getting up, she makes sure her daughter is up for school, takes her medication, makes coffee, listens to the news, drinks several cups of coffee, showers, cooks supper, washes the dishes, watches television, and gets ready for bed. (Id. at 223-30.) With the help of her husband and children, she cares for their dog. (Id. at 224.) Before her impairments, she could work a full-time job, vacation, and play ball. (Id.) Now, she cannot do any of these things. (Id.) She takes medication to sleep. (Id.) She does not have any problems with personal hygiene tasks. (Id.) Three times a week, she cooks meals for the family. (Id. at 225.) She does the laundry and housekeeping chores, with the exceptions of vacuuming and carrying the laundry basket to the washer. (Id.) With the help of her daughter, she goes grocery shopping once a week. (Id. at 226.) Her only hobby is watching television. (Id. at 227.) Her bad mood swings cause her problems getting along with people. (Id. at 228.) Her impairments adversely affect her abilities to lift, squat, bend, stand, walk, sit, kneel, talk, remember, complete tasks, concentrate, understand, and get along with others. (Id.) She can only lift twenty pounds. (Id.) Due to swelling in her legs and feet, she can only walk one block before having to stop and rest for fifteen minutes. (Id.) She can pay attention for only twenty minutes. (Id.) She follows spoken instructions well. (Id.) She does not finish what she starts. (Id.) She does not handle stress or changes in routine well. (Id. at 229.)

Plaintiff's husband completed a Function Report on her behalf. (Id. at 202-09.) He described Plaintiff's daily activities as doing household chores. (Id. at 202.) His descriptions

of her activities is similar to hers.  (Id. at 203-06.)  His assessment of what abilities are affected by her impairments is not as severe, i.e., he noted that her impairments adversely affect only her abilities to lift, squat, walk, talk, remember, complete tasks, concentrate, understand, and get along with others.  (Id. at 207)

Plaintiff reported on a Missouri Supplemental Questionnaire that her medications make her drowsy, dizzy, and forgetful.  (Id. at 222.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 241-44.)  She reported that, beginning in March 2010, she is not able to sit or stand for longer than ten minutes without swelling or cramps.  (Id. at 241.)  It is hard for her to walk.  (Id.)

An earnings report generated for Plaintiff lists annual earnings in 2008 of $4,018.60 and in 2009 of $9,713.14.  (Id. at 148.)  The United States Postal Service paid her $3,063.00 in the second quarter of 2009 and $4,151.00 in the third quarter of 2009.  (Id. at 139.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with those of William Quinn, M.D., who noted on January 10, 2007, that Plaintiff was doing well with the range of motion in her shoulder, but continued to have significant subacromial tenderness.  (Id. at 291.)  She was released to return to work with a restriction of no repetitive use of her arm above shoulder level and no lifting of anything heavier than two pounds continuously and five pounds repetitively.  (Id.)  Plaintiff complained to Dr. Quinn on January 24 of swelling and numbness in her hand.  (Id. at 290.)  He saw "absolutely no swelling."  (Id.)  She had a good range of motion in her shoulder.  (Id.)

Plaintiff complained again to Dr. Quinn on February 9 of intermittent numbness in her hands. (Id. at 289.) She was lifting only ten pounds. (Id.) "She describe[d] some diffuse tenderness which . . . [did] not fit any classic distribution." (Id.) When Dr. Quinn saw Plaintiff on February 23 she was described as being capable of lifting up to forty pounds. (Id. at 288.) He noted on March 13 that the physical therapist felt that Plaintiff was not ready to return to full duty. (Id. at 287.) He anticipated that, with continued therapy, Plaintiff would be able to resume her regular job in two weeks. (Id.)

Dr. Quinn opined on March 28 that Plaintiff had reached maximum medical improvement. (Id. at 286.)

After his final evaluation of Plaintiff's shoulder on June 6, Dr. Quinn concluded that, with active ranges of motion, she lacked approximately fifteen degrees of full abduction, twenty-five degrees of forward flexion, and twenty-five degrees of internal and external rotation. (Id. at 285.) "Passively, she ha[d] full abduction and full forward flexion." (Id.) "She lack[ed] approximately 15 degrees of internal and external rotation passively." (Id.)

In August, Robert Conway, M.D., examined Plaintiff for an impairment rating for her right shoulder. (Id. at 457-60.) Plaintiff reported that she had injured her right shoulder on September 30, 2006; had arthroscopic surgery to repair a rotator cuff tear the next month; underwent seven to eight months of physical therapy; and returned to full-time work in March 2007. (Id. at 458.) Plaintiff was then working twelve to forty-five hours a week. (Id.) She still had persistent, diffuse pain in the right shoulder that radiated down her arm and intermittent numbness in her right arm. (Id.) Dr. Conway thought she might have winging

of the scapula and declined to give a rating until electrodiagnostic studies could be performed.  (Id. at 459.)

Plaintiff had such a study, an electromyogram (EMG) of the right shoulder, in October.  (Id. at 454-56, 461-65.)  It was normal.  (Id.)  On examination, she had 5/5 strength of the left shoulder on flexion and 4/5 strength of the right shoulder on flexion.  (Id. at 455.)  Dr. Robert Conway opined that she had a twenty percent permanent partial impairment of the right upper extremity.  (Id.)  Plaintiff was subsequently found to have a nineteen percent impairment of the right upper extremity and was awarded workers' compensation for the period from August 2007 to September 2008.  (Id. at 468-73.)

In November, a colonoscopy revealed polyps and hemorrhoids.  (Id. at 341-42, 333-35, 397-98, 407-08.)  A biopsy showed there was no malignancy.  (Id. at 347-48.)

On January 10, 2008, due to her strong family history of cancer, Walter R. Peters, M.D., performed an elective total abdominal colectomy on Plaintiff with ileorectal anastomosis and bilateral prophylactic oophorectomy.  (Id. at 307-10, 313-15, 336-38, 343-44, 391-93, 405-06.)  Six inches of her colon were retained.  (Id.)  She was discharged six days later without any dietary restrictions.  (Id. at 307.)

On January 21, Plaintiff informed Dr. Peters that she was "moving her bowels anywhere from five to ten times a day, but notice[d] that this [was] slowing."  (Id. at 380.)  He stated that she could use Imodium A.D. if she was going to be away from home; otherwise, he wanted to see if her bowel function would settle down on its own.  (Id.)  The following month, Plaintiff told him that she was going to the bathroom five to six times a day

without taking any slowing agents.  (Id. at 379.)  She knew she could, but preferred not to, use Imodium to further slow down her bowel function.  (Id.)  Dr. Peters was pleased with her progress.  (Id.)

In April, an ultrasound of Plaintiff's thyroid revealed an "[e]ight-millimeter probable parathyroid adenoma adjacent to the lower pole of the right lobe of the thyroid" and a "[s]mall, well-circumscribed, probably benign nodule in the left lobe of the thyroid."  (Id. at 325, 404, 434-35.)  Consequently, Plaintiff consulted Joe D. Starke, M.D., for an evaluation of her hyperparathyroidism.  (Id. at 377-78.)  He noted that she had no symptoms that could be attributed to the condition, but, in view of her history and youth, decided to screen her for a pheochromocytoma.  (Id. at 377.)  On his recommendation, she had a right inferior parathyroidectomy on May 29.  (Id. at 306, 311-12, 345-46, 388-90, 401.)

At her June 13 follow-up with Dr. Starke, Plaintiff was described as having a normal voice.  (Id. at 375.)  Her calcium and parathyroid hormone levels were to be checked.  (Id.)  If normal, she was to be released from Dr. Starke's care.  (Id.)

In November, Plaintiff consulted Raman Purl, M.D., about problems she was having with fluid retention in the back of her calves.  (Id. at 418.)  Also, her bones ached and she felt tired.  (Id.)  She denied having any back pain or joint pain or swelling.  (Id.)  She also denied nausea, vomiting, diarrhea, constipation, abdominal pain, and changes in her bowel movements.  (Id.)  Her gait was normal, as were her affect, conversation, and bowel sounds.

(Id.)  Her dosage of Synthroid[6] was increased.  (Id.)  Prevacid[7] was prescribed.  (Id.)  Her other medications included Ativan (lorazepam[8]), Lipitor, and HCTZ.[9]  (Id.)

Sometime thereafter,[10] Plaintiff returned to Dr. Purl, reporting that her weight had increased by more than three pounds since the previous visit and she was unable to get rid of the fluid.[11]  (Id. at 417.)  She had stopped the HCTZ and Synthroid three days earlier.  (Id.)  As before, she denied having any bowel problems and any back pain.  (Id.)  She was to have a computed tomography (CT) scan of her abdomen and pelvis.  (Id.)

Plaintiff consulted Jennifer L. Wilson, M.D., in February 2009.  (Id. at 264-65.)  She reported that she had gained approximately forty pounds since her surgery although she exercised regularly and had not changed her diet.  (Id. at 264.)  She was having hot flashes and suffered from insomnia.  (Id.)  And, she had been "very irritable" since the surgery.  (Id.)

---

[6]Synthroid is for the replacement or supplemental therapy for hypothyroidism.  See Physicians' Desk Reference, 543 (65th ed. 2011) (PDR).

[7]Prevacid is prescribed for the treatment of heartburn.  See Prevacid, http://www.medilexicon.com/drugsearch.php?s=prevacid (last visited July 8, 2013).

[8]Lorazepam is a benzodiazepine and is used treat anxiety disorders.  See Lorazepam, http://www.drugs.com/search.php?searchterm=lorazepam (last visited July 8, 2013).

[9]HCTZ is an abbreviation for hydrochlorothiazide, which is prescribed to prevent fluid retention (edema).  See HCTZ, http://www.drugs.com/search.php?searchterm=hctz (last visited July 8, 2013).

[10]The date of the visit is blacked out.

[11]Another undated office note is from Nimish Nemani, M.D., a physician in Dr. Paul's practice.  (Id. at 419)  He noted that Plaintiff's blood pressure had been fluctuating and that she was having mood swings and was under stress.  (Id.)  He prescribed her HCTZ and told her to follow-up with Dr. Paul in two weeks.  (Id.)

- 11 -

Her ankles were swollen, although Dr. Wilson described the severity of the edema as "trace." (Id.)  Plaintiff's only medication was lorazepam.  (Id. at 265.)  She was to see an endocrinologist about the weight gain and was to start HCTZ for the edema.  (Id.)

In March, an external exam by Dr. Peters of Plaintiff's rectal area showed large, internal hemorrhoids.  (Id. at 331-32.)  With the exception of hemorrhoids, a colonoscopy was clean.  (Id. at 329-30, 339-40, 383-85.)

Having been diagnosed with hereditary nonpolyposis colon cancer (HNPCC), Plaintiff consulted Mark Tungesvik, M.D., an oncologist, two weeks later about screening and additional prophylactic measures.  (Id. at 352-64, 369-73.)  Plaintiff was able to carry on with her normal activity.  (Id. at 369.)  Only minor signs or symptoms of her disease were present. (Id.)  The types and frequency of screening tests were outlined.  (Id. at 371.)  Her height was 5 feet 7 inches; her weight was 199.5 pounds.  (Id.)

Three days later, on March 30, Plaintiff had a hemorrhoidectomy to staple her hemorrhoids.  (Id. at 381-82, 399.)  There was no atypia and no malignancy.  (Id.)

Plaintiff saw Dr. Wilson in April for her complaints of anxiety.  (Id. at 266-67.)  She reported that the lorazepam was helpful, but her husband had recently lost his job and, consequently, their health insurance.  (Id. at 266-67.)  Vitamin D was helping to lessen her bone pain.  (Id. at 266.)  On examination, Plaintiff did not appear to have any "unusual anxiety or evidence of depression."  (Id. at 267.)  She did not like the HCTZ; her edema symptoms were mild.  (Id.)

In June, Dr. Wilson changed Plaintiff's thyroid medications from Synthroid to Armour Thyroid after Plaintiff complained that the former caused swelling and increased sweating. (Id. at 268-69.)

In July, Plaintiff reported to Dr. Wilson that she was continuing to suffer from anxiety problems and was taking Ativan once or twice daily. (Id. at 270-71.) Also, she was frequently having diarrhea during the day, and had been since her colon surgeries. (Id. at 270.) If she ate, she immediately felt the need to defecate. (Id.) Dr. Wilson described Plaintiff's anxiety as "controlled with medication." (Id. at 271.)

Plaintiff told Dr. Wilson the following month that she had been increasingly lightheaded and fatigued during the past few weeks. (Id. at 272-73.) She was taking two tablets of Ativan at bedtime to help her sleep, but was not sleeping well and was frequently waking up at night. (Id. at 272.) Dr. Wilson thought the increased use of Ativan was contributing to Plaintiff's dizziness, but Plaintiff informed her that she had used Ativan for years without problems. (Id. at 273.) Dr. Wilson also thought that Plaintiff's lack of sleep was contributing to her dizziness and advised her to try taking trazodone,[12] which Plaintiff had at home. (Id.) Plaintiff was to call if her symptoms persisted. (Id.)

In September, Plaintiff requested that Dr. Wilson increase her dosage of Armour Thyroid. (Id. at 274-75.) As before, her anxiety symptoms were controlled by Ativan. (Id. at 274.)

---

[12]Trazodone is prescribed for the treatment of major depressive disorder. See PDR at 3447.

Plaintiff reported to Dr. Wilson in November that she was very irritable, anxious, and angry and had been more depressed the past few weeks. (Id. at 276-77.) She was finding it difficult to work because of her need to immediately use the bathroom after eating. (Id. at 276.) She had noticed "some improvement" in her edema when taking the HCTZ; she continued, however, to have some swelling at the end of the day on her right side. (Id.) On examination, she did not display any depression or unusual anxiety. (Id. at 277.) Her medications included Celexa, Armour Thyroid, lorazepam, vitamin D, HCTZ, Diflucan (an antifungal antibiotic), and Cipro.[13] (Id.)

Two weeks later, Plaintiff told Dr. Wilson that she had developed diarrhea two days after starting the medication.[14] (Id. at 278-79.) She also stated that she had taken the medication for five days and had diarrhea the entire time. (Id. at 278.) The diarrhea started improving after she stopped taking the medication. (Id.) Dr. Wilson opined that the diarrhea was a side effect of the medication or of an infection. (Id. at 279.) She noted that Plaintiff's diarrhea had currently resolved. (Id.) Plaintiff also informed Dr. Wilson that she was losing her medical insurance and could not afford medication. (Id. at 278.) She was to see if the diarrhea returned if she took one-half tablet of Celexa every other day. (Id. at 279.)

Plaintiff again saw Dr. Tungesvik in December, reporting that she had been doing well since her last visit. (Id. at 349-51, 365-68.) There was no evidence of any cancer growth. (Id. at 366.)

---

[13]Cipro "is indicated for the treatment of infections caused by . . . microorganisms." PDR at 1958.

[14]Which medication is not specified.

In January 2010, Plaintiff complained to Dr. Wilson of right-sided low back pain for the past several days.  (Id. at 261-63.)  The pain would began approximately thirty minutes after eating, was worse with bending, and was less when lying back.  (Id. at 261.)  At its worst, it was a ten on a ten-point scale.  (Id.)  Her chronic problems included hypothyroidism, depressive disorder, vitamin deficiency, and anxiety.  (Id.)  Her medications included Zoloft,[15] lorazepam, Armour Thyroid, HCTZ, Diflucan, and Cipro.  (Id.)  She also took vitamin D.  (Id.)  On examination, she was in no apparent distress, was alert and oriented, and did not have any unusual anxiety or evidence of depression.  (Id. at 262.)  There was  no edema.  (Id.)  Because of the timing of the pain and her history of colon surgery, CT scans of her abdomen and pelvis were obtained.  (Id.)  The scans revealed a possible hemangloma at the liver and a small cyst.  (Id. at 322, 413, 480.)

Plaintiff consulted Shirley Thompson, A.P.R.N. (advanced practice registered nurse) B.C. (board certified), F.N.P./G.N.P. (family nurse practitioner/geriatric nurse practitioner), in August, explaining that she had been seeing Dr. Wilson, but no longer was because she was no longer insured.  (Id. at 481-83.)  She had a history of manic depression, had been taking Zoloft for the past year, and was doing okay.  (Id. at 481.)  She also did well on lorazepam.  (Id.)  She had palpitations, a racing heart, and anxiety.  (Id.)  She needed a refill of her medications.  (Id.)  It was noted that she smoked two packs of cigarettes a day.  (Id.)  Ms. Thompson consulted with Dr. Bennett, who wrote a prescription for lorazepam, Zoloft,

---

[15]Zoloft is a brand name for sertraline and is prescribed for the treatment of panic attacks and depression.  See Zoloft (sertraline HCI), http://www.medilexicon.com/drugs/zoloft_292.php (last visited July 8, 2013).

- 15 -

and Metoprolol (for hypertension).  (Id.)  Plaintiff was to return in one to two months to see Paula Bennett, M.D.  (Id.)

She returned in October.  (Id. at 484.)  She reported having a skin condition caused by frequent bowel movements.  (Id.)  Dr. Bennett prescribed Ativan.  (Id.)

In November, Plaintiff again saw Dr. Bennett.  (Id. at 485.)  Her disability hearing was in two weeks.  (Id.)  She needed refills of Ativan and her thyroid medication, and complained of low back pain and of frequently needing to use the bathroom.  (Id.)  She was to stop taking HCTZ.  (Id.)

Also before the ALJ were two assessments of the causes of Plaintiff's impairments and their resulting limitations.

In April 2010, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Robert Cottone, Ph.D.  (Id. at 436-46.)  Plaintiff was assessed as having an affective disorder, i.e., depression, and an anxiety-related disorder.  (Id. at 436, 439-40.)  These disorders resulted in mild restrictions in her daily living activities and caused her mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  (Id. at 444.)  There were no repeated episodes of decompensation of extended duration.  (Id.)  Dr. Cottone noted that Plaintiff had only sought mental health treatment from her primary care physician.  (Id. at 446.)

That same month, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by a single decisionmaker.[16]  (Id. at 447-53.)  The diagnoses were hypothyroidism, status-post colon resection, and status-post rotator cuff repair.  (Id. at 447.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, sit, or walk for approximately six hours in an eight-hour day.  (Id. at 448.)  Her ability to push and pull was limited in her upper extremities.  (Id.)  She had postural limitations of never climbing ropes, ladders, or scaffolds and only occasionally climbing ramps and stairs.  (Id. at 449.)  She was limited in her ability to reach overhead, but had no other manipulative limitations.  (Id.)  She had no visual or communicative limitations.  (Id. at 450.)  She had one environmental limitations – she should avoid even moderate exposure to vibrations.  (Id.)

### The ALJ's Decision

Examining Plaintiff's application under the Commissioner's sequential evaluation process, see pages 21 to 23, infra, the ALJ determined at step one that Plaintiff met the insured status requirements of the Act through September 30, 2013.  (Id. at 21.)  The ALJ further found that Plaintiff, having earned $3,063 in the second quarter and $4,151 in the third quarter of 2009, had engaged in substantial gainful activity since her alleged onset date of January 1, 2008.  (Id.)  Consequently, the ALJ focused on the time after her alleged onset date during which she did not engage in substantial gainful activity.  (Id. at 22.)

---

[16]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

At step two, the ALJ determined that Plaintiff had severe impairments of status-post colon resection, status-post right rotator cuff repair, and obesity. (Id.) Her anxiety was not severe. (Id.) Specifically, Plaintiff's anxiety resulted in mild limitations in the functional areas of (1) activities of daily living; (2) social functioning; and (3) concentration, persistence, or pace. (Id. at 23.) She had not had any episodes of decompensation of extended duration. (Id.)

The ALJ found at step three that Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity. (Id. at 23.) The ALJ noted that Plaintiff's "first allegation of frequent bowel movements was reported in October 2010." (Id. at 24.)

The ALJ next addressed the question of Plaintiff's residual functional capacity (RFC). (Id. at 24-27.) He found that she had the RFC to perform light work with additional limitations of only occasionally stooping, balancing, and climbing ramps and stairs; never kneeling, crouching, crawling and climbing ladders, ropes, or scaffolds; never performing overhead work that required the use of her right upper extremity; and avoiding even moderate exposure to vibrations and workplace hazards. (Id. at 24.) When assessing Plaintiff's RFC, the ALJ evaluated her credibility under the relevant factors. (Id. at 24-27.) He found her subjective complaints not to be fully credible, noting that she testified that she was searching for full-time work and was currently working part-time. (Id. at 25.) Another inconsistency was Plaintiff's daily activities, which included, among other things, preparing meals, lifting twenty pounds, doing housekeeping chores, with the exception of vacuuming, and shopping.

(Id.)  Nor did the objective medical evidence support her complaints.  (Id.)  This lack included the absence of any complaints of frequent bowel movements until October and November of 2010.  (Id. at 26.)

With her RFC, the ALJ determined at step four that she could return to her past relevant work as a post office clerk, general clerk (permit), cashier/checker, assistant manager of a convenience store, and assembly production worker.  (Id. at 28.)  She was not, therefore, disabled within the meaning of the Act.  (Id.)

### Additional Records Before the Appeals Council

After the ALJ rendered his adverse decision, Plaintiff submitted additional medical records to the Appeals Council.  The earliest of these is a July 2011 evaluation of Plaintiff by Chad E. Jones, M.S., C.R.C., N.C.C. (national certified counselor), and L.P.C.  (Id. at 487-90.)  He listed her diagnoses as bipolar disorder II and borderline personality disorder. (Id. at 487-90.)  She had a Global Assessment of Functioning of 65.[17]  (Id. at 487.)  Her manic symptoms included racing thoughts, sleeplessness, poor self-image, and "uncharacteristically frustrated with feelings of anger."  (Id.)  Her depressive symptoms included feelings of sadness, decreased energy, lost of interest, sleep irregularities, and

---

[17]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

inability to pay attention or concentrate. (Id.) Her anxiety symptoms included excessive worry and feeling tense. (Id.) Her "[p]ersistently elevated/agitated mood impede[d] [her] ability to concentrate." (Id.) Plaintiff reported that she would have to leave her job tasks unattended once every fifteen to twenty minutes to spend at least five to ten minutes in the bathroom. (Id. at 488.) Out of an eight-hour work day, she would spend approximately one hour in the bathroom. (Id. at 489.) Mr. Jones noted that "[a] thorough evaluation of medical provider progress notes . . . as well as formal psychological evaluations should be completed to confirm [Plaintiff's] verbal statements as an individual who is permanently and duly disabled and unable to work for a period of at least one year." (Id. at 489-90.)

The December 2011 notes of Dr. Bennett list medication refills and diagnoses of depression, anxiety, hyperthyroidism, nicotine addiction, and hemorrhoids. (Id. at 493-96.)

Also before the Appeals Council was a January 2012 letter from Plaintiff, explaining that she was going through a divorce and was bi-polar and manic depressive. (Id. at 255-58.) Because of her restricted diet, she has lost over eighty pounds. (Id. at 255.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff

v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ's decision (1) is not supported by substantial evidence on the record as a whole because he (a) did not consider supporting medical facts, (b) ignored her severe impairments of anxiety and edema, and (c) failed to consider the side effects of her medications; (2) is improperly based on a record that has not been fully developed about her past relevant work; and (3) includes a deficient analyzation of her credibility. The Commissioner disagrees with all three arguments.

The Record as a Whole.  Plaintiff first challenges the ALJ's statement that the medical records do not reflect a complaint by her of frequent bowel movements until October 2010. She notes that she complained to Dr. Peters about bowel movements in February 2008; had hemorrhoid problems; complained in July 2009 of diarrhea and the need to defecate; complained in November 2009 of frequent defecation; and complained again the following month of diarrhea.

Plaintiff did inform Dr. Peters in February 2008 that she was going to the bathroom five to six times a day.  This was without taking Imodium or any other slowing agent, as Plaintiff preferred not to do.  Nine months later, when consulting Dr. Purl, she denied having any diarrhea *and* any changes in her bowel movements.  She again denied having any such problems when she next saw Dr. Purl.  In July 2009, eighteen months after last speaking with a health care practitioner about her bowel movements, Plaintiff complained to Dr. Wilson about frequent diarrhea and the need to defecate immediately following a meal.  This latter complaint was expressed again in November 2009.  Two weeks later, Plaintiff's diarrhea was thought to be a side effect of her medication and to have been resolved when she stopped taking that medication.  When Plaintiff again complained of the *frequency* of bowel movements, it was, as noted by the ALJ, in October 201 and was in the context of her having a skin condition allegedly caused by the frequency.

In the thirteen visits for medical attention between Plaintiff's February 2008 complaint of bowel movements five to six times a day and her October 2010 complaint of a skin condition she attributed to frequent bowel movements, she did not consistently complain of

diarrhea or of needing to defecate following a meal. Indeed, she sometimes reported no bowel problems. In March 2009, she informed Dr. Tungesvik, an oncologist she consulted about her family history of colon cancer, that she could carry on her normal activities. This was more than one year after her alleged disability onset date. And, when she did complain of diarrhea or of needing to defecate after eating, she did not, with one exception, describe either as an impediment to her activities. The one exception is when she informed Dr. Wilson in November 2009 – thirteen months after her alleged disability onset date – that she was finding it difficult to work because she needed to use the bathroom immediately after eating. This complaint was never repeated.

As noted above and by the Commissioner, the ALJ's decision may not be reversed "'simply because some evidence may support the opposite conclusion.'" **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)). Evidence of sporadic complaints about diarrhea and the need to defecate after eating does not require the reversal of a decision based on the lack of evidence of consistent complaints about the *frequency* of the need to defecate. See e.g., **Bauer v. Astrue**, 2013 WL 2444072, *8 (D. Neb. June 5, 2013) (noting that complaints of alternating bouts of diarrhea and constipation were not the same as complaints of "overwhelming frequency"); **Mayfield v. Astrue**, 2012 WL 5904331, *17-18 (W.D. Mo. Nov. 26, 2012) (holding to similar effect).

Plaintiff also challenges the ALJ's failure to find that her edema and anxiety are severe impairments.

"An impairment . . . is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  Thus, "[i]f the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe."  **Id.**

Plaintiff correctly notes that Dr. Wilson observed in February 2009 that Plaintiff's ankles were pitted and swollen.  She omits, however, Dr. Wilson's characterization of the swelling as "trace."  Four months earlier, Plaintiff had been prescribed HCTZ to prevent edema.  When reporting sometime thereafter that she was unable to get rid of retained fluid, she also reported that she had stopped taking the HCTZ.  In February 2009, Dr. Wilson "start[ed]" Plaintiff on HCTZ.  (R. at 265.)  Two months later, Plaintiff's edema symptoms were "mild."  (Id. at 267.)  Nine months later, there was no edema.

"Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  **Id.** at 708 (interim quotations omitted).  There is no evidence to support Plaintiff's argument that her occasional, mild edema is a severe impairment.

Nor is there evidence to support Plaintiff's argument that the ALJ erred by not finding her anxiety to be severe.  The use of Ativan, an anti-anxiety medication, see page 11, supra, alone does not establish that her anxiety is severe.  See **Matthews v. Bowen**, 879 F.2d 422, 424 (8th Cir. 1989) (prescription of anti-depressant medication was not sufficient to support claimant's allegation of disabling psychological complaints).  Rather, in determining whether

Plaintiff's anxiety was severe, the ALJ was required "to consider 'four broad functional areas in which [the ALJ] [was to] rate the degree of [her] functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1520a(c)(3)). A mental impairment is considered not severe if the claimant's limitation in the first three functional areas is "none" or "mild" and in the fourth area is "none." **Id.** at 557. The ALJ assessed Plaintiff's limitations in the first three areas to be "mild" and in the fourth area to be "none." There is substantial evidence on the record to support his assessment. Other than Plaintiff's description of her mental state, found not to be entirely credible by the ALJ,[18] there is nothing in the record to suggest a greater limitation in any of the four functional areas than he found. Plaintiff was consistently observed as having a normal affect and as not appearing anxious. She reported that her anxiety was controlled with medication, Ativan, that she had been taking for years. "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)); accord **Wildman v. Astrue**, 596 F.3d 959, 965 (8th Cir. 2010). See also **Banks v. Massanari**, 258 F.3d 820, 826 (8th Cir. 2001) (claim of disabling depression was inconsistent with improvement of condition once claimant started taking anti-depressants).

Plaintiff next faults the ALJ for not considering or discussing the side effects of her medications. She alleges that these effects include drowsiness and forgetfulness.

---

[18]The ALJ's credibility assessment is addressed below.

Plaintiff's medical records reflect two concerns about side effects. One was in August 2009. Dr. Wilson thought the Ativan was having a side effect of dizziness. Plaintiff said it was not. The other was in November 2009. Dr. Wilson thought a medication was causing Plaintiff diarrhea after Plaintiff reported that her diarrhea had stopped once she stopped taking the medication. The evidence on which Plaintiff relies is her own report of side effects when applying for DIB. The ALJ, however, found her not to be entirely credible. See **Van Vickle v. Astrue**, 539 F.3d 825, 829 (8th Cir. 2008) (finding that ALJ had not erred when determining that claimant's medications did not cause any significant side effects; medical records did not mention any such effects and only evidence of such was claimant's testimony).

As further support for her argument that substantial evidence on the record as a whole establishes that she is disabled, Plaintiff cites the report of Mr. Jones. Her reliance on this report is unavailing for two reasons. First, Mr. Jones is not an acceptable medical source. See 20 C.F.R. § 404.1513(a) (defining who is an acceptable medical source). Although a counselor, which is Mr. Jones' profession, may be an "other medical source," see 20 C.F.R. § 404.1513(d), Mr. Jones saw Plaintiff only once, saw her only for an evaluation, and noted that his conclusions were based on her statements and not on a review of any treatment records. See **McCoy v. Astrue**, 648 F.3d 605, 616-17 (8th Cir. 2011) (finding that ALJ had not erred by discrediting claimant's treating physician's findings about claimant's functional limitations when those findings were based on the claimant's "self-reported symptoms").

Evidence of Past Relevant Work. Plaintiff argues that the ALJ erred by not inquiring about the exertional and non-exertional demands of her past relevant work and by not eliciting

from the VE the DOT codes for the various jobs cited by the VE as being ones Plaintiff could perform.

As noted above,

> [a]t the fourth step in the five-step sequential evaluation process for determining eligibility for social security benefits, an ALJ compares a claimant's RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1520(f). If the ALJ determines the claimant can perform her past relevant work, the claimant is not disabled. See id. In making this determination, an "ALJ has a duty to fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before [the ALJ] determines that she is able to perform her past relevant work." Nimick v. Sec'y of Health & Human Servs., 887 F.2d 864, 866 (8th Cir.1989).

**Young v. Astrue**, 702 F.3d 489, 491 (8th Cir. 2013). "[T]he [Social Security Administration] and the courts have allowed consideration of whether a claimant could perform the work not as a claimant did it, but 'as it is generally performed in the national economy.'" **Wagner**, 499 F.3d at 853. When evaluating whether a claimant can perform past relevant work, the ALJ may elicit testimony from a VE. **Id.** at 853-54.

In the instant case, the ALJ elicited testimony from the VE about the demands of Plaintiff's previous jobs as they are generally performed and about whether Plaintiff, with her RFC, could perform such jobs. Plaintiff contends that the ALJ should also have elicited from the VE the DOT codes because, without such codes, "it is impossible to check the validity of the VE's testimony." (Pl.'s Br. at 13, ECF No. 25.)

The VE characterized Plaintiff's past relevant work in terms of its exertional and skill demands and its SVP levels. For instance, her job as cashier/checker was light, semi-skilled

and had an SVP of three. The DOT describes a cashier-checker position as light, with an SVP of three, and with no exposure to such workplace hazards as moving mechanical parts, high exposed places, and vibrations. See DOT § 211.462-014. The job of post office clerk is described in the DOT as light work with an SVP of four, just as described by the VE. See DOT § 243.367-014.

Plaintiff does not argue that the VE's description of the cited jobs conflicts with the DOT. Rather, she argues that the failure of the VE to specify the DOT codes for those jobs precludes her from ascertaining whether there is such a conflict. In **Hulsey**, 622 F.3d at 921-23, the Eighth Circuit was able to meaningfully review a claimant's argument that she was unable to perform some unskilled work which was a part of the jobs cited by the VE. In that case also, the VE had not specified the DOT codes for the occupations she had identified as being able to be performed by the claimant. The claimant, however, was able to cite to the six different DOT listings for the general occupation described by the VE, including to five DOT listings which did not conform to the demands of the job relied on by VE. The Eighth Circuit found it "evident" that the VE "had in mind" the sixth DOT listing, which did include the demands required by the claimant's RFC. **Id.** at 923. Similarly, in the instant case, there are DOT listings for the various occupations cited by the VE which include the exertional and skill demands described by the VE in response to the ALJ's hypothetical questions.

Plaintiff's argument to the contrary is without merit.

Credibility. In her final argument, Plaintiff contends that the ALJ improperly analyzed her credibility by overstating the extent of her daily activities, activities which she alleges he purposely structures to minimize her symptoms.

In **Renstrom**, 680 F.3d at 1066, the Eighth Circuit rejected a claim that the ALJ had erred when negatively assessing his credibility based on his performance of some chores and limited activities. The court found that other considerations of the inconsistency between the claimant's reported impairments and the medical evidence and of his improvement with treatment supported the assessment. **Id.** In the instant case, there are also other considerations. These considerations include Plaintiff's receipt of unemployment benefits after her alleged disability onset date and her applications for cashier jobs after that date. See **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998). Also relevant is Plaintiff continuing to work with her anxiety – listed as a disabling impairment – for years without any evidence that the anxiety had worsened and to work after her rotator cuff surgery. See **Martise v. Astrue**, 641 F.3d 909, 924 (8th Cir. 2011) (affirming denial of benefits to claimant alleging disabling migraine headaches when claimant had worked for several years with headaches and there was no medical evidence that they had worsened); **Goff**, 421 F.3d at 792-93 (finding that ALJ had properly considered that the claimant worked for three years with allegedly disabling impairments when evaluating his credibility). Inconsistencies in the record further detract from her credibility. See **McCoy**, 648 F.3d at 614. These inconsistencies include Plaintiff's testimony that she had been diagnosed with colon and thyroid cancer; the medical records indicate only that she had a strong family history of such and elected, understandably, to take

prophylactic measures. She reported that the swelling in her feet and legs prevent her from walking farther than one block; however, contemporaneous medical records never describe her edema as more than mild. She testified that she had had problems with depression and anxiety since 2008; however, she informed Dr. Wilson in August 2009 that she had been taking an anti-anxiety medication for years. She testified that she immediately goes to the bathroom when she returns home from work and stays there until it is time for her to return to work; however, she also reported she prepares the family meals, does laundry and household chores, goes grocery shopping, watches television, and visits with family and friends.

Additionally, the ALJ cited the lack of supporting objective medical evidence when evaluating Plaintiff's credibility. "Although an ALJ may not discount a claimant's allegations of disabling pain *solely* because the objective medical evidence does not fully support them,'" the lack of such is a proper consideration. **Buckner**, 646 F.3d at 558 (quoting Goff, 421 F.3d at 791) (emphasis added).

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner**, 646 F.3d at 558. The ALJ having given good, and supported, reasons for his adverse credibility assessment, that assessment should not be reversed.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964. Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  18th  day of July, 2013.